**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-03058-GPG-MDB

ESTATE OF ANTHONY LONG, by and through its personal representative NORMA LONG; and
NORMA LONG,

 Plaintiffs,

v.

CORECIVIC INC.;
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BENT;
VIRGIL ENSEY, individually; and
LARRY COX, individually; and
BECKY LEWIS, individually,

 Defendants.

---

**AMENDED CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

---

 Plaintiff Norma Long, as personal representative for the Estate of Anthony Long and individually, through her attorney, Aurora L. Randolph of ALR CIVIL RIGHTS LLC, hereby submits this Amended Complaint[1] against all Defendants and requests a trial by jury as follows.

### I. JURISDICTION AND VENUE

 1. This action arises under the Constitution and laws of the United States and the State of Colorado including 42 U.S.C. § 1983. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. § 1331.

---

[1] Plaintiff submits this pursuant to the Court's Order (ECF No. 5) striking her initial complaint.

2. Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent state causes of action derive from a common nucleus of operative facts.

3. Jurisdiction supporting the claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

4. This Court has personal jurisdiction over all the named Defendants because they either reside in the State of Colorado or they conduct systematic and continuous business within the State of Colorado.

5. Venue in the District of Colorado is proper under 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## II.    PARTIES

6. At all times relevant to the subject matter of this litigation, the decedent Anthony Long and his wife Norma Long were citizens of the United States and residents of the State of Colorado.

7. At all times relevant to the subject matter of this litigation, Mr. Long was a prisoner of the State of Colorado housed at Bent County Correctional Facility ("BCCF").

8. The Estate of Anthony Long was opened in Bent County and the personal representative of the Estate is Mr. Long's wife, Norma Long.

9. At all times relevant to the subject matter of this litigation, Defendant CoreCivic was (and is) a private, for-profit corporation that contracted with Bent County to imprison individuals in the custody of the Colorado Department of Corrections.

2

10. Defendant CoreCivic operates Bent County Correctional Facility ("BCCF"), including during all times relevant to the subject matter of this litigation.

11. Defendant CoreCivic is a private corporation doing business in the state of Colorado with its registered agent in Colorado as The Corporation Company at 7700 E. Arapahoe Rd. Ste. 220, Centennial, CO 80112.

12. Defendant CoreCivic is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies and practices. Upon entering into agreements to imprison and care for prisoners at BCCF, CoreCivic assumed public functions, acted under color of state law, and is legally responsible to comply with all requirements of the United States Constitution.

13. CoreCivic is also properly sued for its own negligence and the negligence of its agents and employees under state law.

14. Defendant Board of County Commissioners of the County of Bent (hereinafter "BOCC," "Bent County," or "County") is a governmental entity chartered under the laws of the State of Colorado, located at 725 Bent Avenue, Las Animas, Colorado.

15. The commissioners of the BOCC are elected solely by the citizens of Bent County, Colorado. The BOCC provides representation of and authority over the finite geographical area of Bent County, Colorado.

16. For years and at all times relevant to this Complaint, the BOCC on behalf of Bent County, has contracted with the State of Colorado and agreed to incarcerate, house, care for, and program state prisoners at BCCF.

17.     At all times relevant to this Complaint, Defendant BOCC has chosen to hire CoreCivic to handle Bent County's assumed responsibility for these state prisoners and to house, incarcerate, program, and care for those at BCCF.

18.     The BOCC is a proper defendant under 42 U.S.C. § 1983.  Although the County has privatized the operation of BCCF and care of its state prisoners, it has a non-delegable duty under 42 U.S.C. § 1983 to provide constitutionally adequate conditions, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices, practices, customs, and training by such private contractors.  Thus, it is properly sued for the deliberately indifference policies and practices of CoreCivic, as well as its own.

19.     At all times relevant to this Complaint, Defendant Virgil Ensey was the Warden of BCCF, an agent, employee, and/or subcontractor of CoreCivic, and was responsible for the care and safety of state prisoners at his facility, including Anthony Long, during his incarceration.

20.     At all times relevant to this Complaint, Defendant Larry Cox was the Associate Warden at BCCF, an agent, employee, and/or subcontractor of CoreCivic, and was responsible for the care and safety of state prisoners at his facility, including Anthony Long, during his incarceration.

21.     At all times relevant to this Complaint, Defendant Becky Lewis was a case manager at BCCF, an agent, employee, and/or subcontractor of CoreCivic, and was responsible for the classification, care and safety of state prisoners at BCCF and on her case load, including Anthony Long, during his incarceration.

22.     At all material times, Defendants Ensey, Cox, and Lewis were acting under the color of state law, were citizens of the United States of America and residents of the State of Colorado.

### III.     FACTUAL ALLEGATIONS

**A.     Bent County Took Responsibility for State Prisoners for Large Sums of Money**

23.     At all times relevant to this Complaint, including from 2019-2023, the State of Colorado contracted with Bent County (through the BOCC) for the confinement and maintenance of prisoners sentenced to imprisonment by the state and paid Bent County for expenses incurred in the confinement and maintenance of the prisoners.

24.     In July 2019, Bent County BOCC Chairwoman Jean Sykes signed the contract on behalf of Bent County with the State of Colorado to provide beds and programs in a detention facility comparable to State run facilities (herein after "the BOCC/CDOC Contract" or "Contract").

25.     The 2019 BOCC/CDOC Contract has repeatedly been renewed with simple option letters in subsequent years, including up to and beyond 2023.[2]

26.     Under the Contract, Bent County is paid a fixed dollar amount per prisoner per day at a daily rate set by the Colorado State Legislature.

27.     Under the Contract, Bent County agreed to house up to approximately 1388 state prisoners and to provide them care and treatment, including routine and emergency medical care,

---

[2] All terms of the Contract and Agreement described herein are the terms in place at all times relevant to this case – *i.e.* from at least 2020-2023.

provide for their physical needs, make available work, training and treatment programs, and retain them in safe, supervised custody, maintaining proper discipline and control.

28.    Under the BOCC/CDOC Contract, Bent County agreed to pay for all positions within BCCF and to maintain staffing at BCCF in sufficient numbers and rank to maintain the safety of the public, staff, and prisoners.

29.    The Contract provides a mandated <u>minimum</u> staffing plan as part of the agreement because, as it notes, sufficiently staffed security, health services, and other positions are required to ensure the safe, secure, orderly, and appropriate operation of the facility.

30.    This plan does not account for all positions required to operate the facility but just those "critical" or mandatory posts that will result in damages if unfilled by Bent County.

31.    Under the Contract, Bent County agreed to develop a plan for sufficient staffing to meet the <u>minimum</u> staffing plan.

32.    Under the Contract, Bent County agreed that CDOC would assess liquidated damages against it when Bent County 1) failed to timely staff mandatory posts at BCCF, or 2) failed to timely fill on a permanent basis positions that have been vacant for 45 or 60 days at BCCF.

33.    Bent County agreed to provide all necessary training for staff at BCCF.

34.    Under the Contract, Bent County agreed to provide all onsite medical and mental health care and education/programming for the state prisoners at BCCF.

35.    Under the Contract, CDOC agreed to provide records and reports of its contract compliance, audits, and monitoring of BCCF to Bent County.

36.     Thus, CDOC provided Bent County copies of all audits and reports regarding BCCF, including memos regarding staffing deficiencies.  And the BOCC was aware of the staffing deficiencies at BCCF from at least 2020-2023.

37.     Under the Contract, Bent County agreed to perform its duties as an independent contractor and not as an employee and agreed it would not be deemed to be an agent or employee of the State of Colorado.

38.     In the Contract, Bent County agreed to indemnify the State against any and all costs, expenses, claims, damages, liabilities, court awards and other amounts incurred in relation to any act or omission by Contractor, or its employees, agents, Subcontractors, or assignees in connection with the Contract.

39.     In other words, the State is not legally obligated to pay any judgment rendered against Bent County or CoreCivic regarding conditions at BCCF.

40.     For its services under the Contract, the State of Colorado paid Bent County over $20 million/year between 2020-2023.

**B.     The BOCC Hired CoreCivic to House and Incarcerate the State Prisoners it was Responsible for Under the BOCC/CDOC Contract**

41.     In the Contract, CDOC permitted the BOCC to choose to operate and manage BCCF pursuant through the use of a subcontractor, like CoreCivic, if it desired to do so.

42.     In the Contract, Bent County agreed that it accepted full responsibility for the actions of its subcontractors and that subcontracting did not relieve it from any responsibility, and that Bent County was at all times responsible for all performance under the Contract.

43.     From at least 2019 to 2023, the BOCC contracted with CoreCivic to operate BCCF and incarcerate the state prisoners that Bent County was responsible for under the

BOCC/CDOC Contract (this agreement referred to herein as "CoreCivic/BOCC Agreement" or "Agreement").

44.     From at least 2020-2023, the County renewed the Agreement with CoreCivic.

45.     BCCF is a Level III facility which is for housing medium custody level prisoners.

46.     At all times relevant to this Complaint, CoreCivic incarcerated state prisoners at BCCF and Crowley County Correctional Facility ("CCCF"). It also operated two other facilities in Colorado that were later closed in the 2010s.

47.     In 2023, CoreCivic's total revenue was approximately $1.90 billion.

48.     Through the Agreement, the BOCC delegated final policymaking authority with respect to the operation of BCCF to CoreCivic.  The BOCC delegated the entire operation of BCCF to CoreCivic.

49.     Under the CoreCivic/BOCC Agreement, Bent County paid CoreCivic less than the State of Colorado paid the County to incarcerate state prisoners and pocketed the rest.  Thus, Bent County made large sums of money every year from its choice to subcontract with CoreCivic to operate BCCF.

50.     For years, Bent County received millions of dollars monthly from the State of Colorado under the BOCC/CDOC Contract.

51.     The amount that Bent County received each month from the State of Colorado had the liquidated damages for the understaffing at BCCF (*i.e.* the damages assessed for any failures to meet the <u>minimum</u> staffing plan) itemized and deducted from the payment to the County.

52. Thus, through the liquidated damages withheld by the State every month (*see infra* Section K), Bent County was aware from at least 2019-2023 that CoreCivic had been severely understaffing BCCF and allowing many critical positions to sit vacant for long periods.

53. Under the Agreement, after receiving the payment from the State, minus the liquidated damages, Bent County retained its profit and then paid the rest to CoreCivic for CoreCivic's operation of BCCF and its incarceration of the state prisoners therein.

54. Under the Agreement, the County profited at least $2.00/day for each prisoner at BCCF. In 2023 alone, Bent County profited at least $475,882 from the BOCC's decision to subcontract with CoreCivic to incarcerate individuals on its behalf.

55. Thus, both CoreCivic and Bent County make more money the more prisoners that are housed at BCCF, regardless of whether the facility and/or CoreCivic are unable to *safely* house those prisoners under the care of the County.

56. Bent County is aware of and responsible for the operations by CoreCivic of BCCF and the care and safety of the prisoners therein.

57. However, Bent County has delegated final policymaking authority with respect to the operation of BCCF to CoreCivic at all times relevant to this Complaint.

58. Bent County essentially only pays CoreCivic for incarcerating state prisoners for it and conducts no oversight functions whatsoever.

59. On information and belief, Bent County has conducted no audits, reviews, or other supervision of the operation at BCCF from 2020-2023.

60. Bent County has also taken no actions to train staff at BCCF nor taken actions to ensure adequate training of those staff.

61.     In short, the County has taken no actions to ensure CoreCivic is meeting the requirements of the BOCC/CDOC Contract nor has it taken any actions to meaningfully oversee or supervise CoreCivic, despite its knowledge of the many problems at BCCF and CoreCivic's history of failing to provide adequate conditions for prisoners.

**C.     Anthony Long, the History of the Long Family, and Mr. Long's Incarceration**

62.     Anthony and Norma Long were married in 1991.

63.     In 2010, Mr. Long was convicted of a sexual offense and was paroled in 2019.

64.     Unfortunately, in 2021, Mr. Long was rearrested and placed back into the custody of CDOC.  By this time, Mr. Long was an elderly and vulnerable man.

65.     Mr. Long's inmate files show he was considered to be illiterate in English and reflect that he had various health issues in addition to his older age.

66.     In addition to his sexual offenses, Mr. Long had COPD, needed (but did not have) dentures as he had no teeth, relied on a cane to walk after a serious stroke left him struggling to walk and speaking clearly, had various heart conditions (including having suffered a heart attack), had GI problems, and was so skinny that he was once toppled over by the wind.

67.     Mr. Long's inmate records from November 2021 show CDOC placed an alert in his file noting he was "victim prone," and noted his child sex offense convictions.

68.     It is a well-known fact in corrections that sex offenders are the bottom of the prison social hierarchy, and those with convictions on a child victim are even more strongly targeted and punished through "prison justice" by other prisoners and even prison officials.

69. Therefore, prisons have to exercise extreme caution, diligence, and care in housing these individuals and most frequently create sex offender units to avoid any one prisoner being singled out for violence and to ensure those people can receive appropriate treatment.

70. BCCF does not maintain such a safe or sex offender unit (a/k/a "soft yard") which would require more staffing, programming, and resources.

71. A CDOC investigation after the murder revealed that several prisoners in the unit reported to the CDOC investigators that BCCF "is out of control" with violence.

72. CoreCivic and its staff (including the Individual Defendants) had access to Mr. Long's inmate records – including the flags and alerts that indicated he was a vulnerable individual – and reviewed that information when housing him in BCCF.

73. Nonetheless, in late 2021, after reviewing whether the facility could house him, including reviewing his inmate files, alerts, convictions, and medical records, CoreCivic agreed to house Mr. Long at BCCF, and take responsibility for his care and safety.

74. Records show CoreCivic staff, including his case manager Defendant Becky Lewis, reviewed Mr. Long's inmate file and status as a sex offender and placed him in general population at BCCF.

75. Mr. Long was not placed in a safer unit or with other sex offenders – who do not face the same institutional and gang pressures as other prisoners to attack, torture, and exploit fellow sex offenders – or other older or medically restricted prisoners like himself who are also less violent and less likely to violently target him for his convictions.

76. Mr. Long was an inappropriate prisoner for BCCF general population given his medical and treatment needs, sex offender status, and low security risk.

**D.      Mr. Long is Placed In BCCF and Ms. Long Dutifully Moves with Him**

77.      Mr. Long was housed at BCCF in Las Animas, Colorado in 2021.

78.      Due to his age, medical conditions, and sex offender status, Mr. Long was previously incarcerated at Fremont Correctional Facility where there was treatment and close access to more medical care, including a hospital.

79.      BCCF did not offer SOTMP treatment for sex offenders from 2020-2023.

80.      During 2022, Mr. Long was able to keep his conviction under wraps.  But he had various problems receiving the care and treatment he needed at BCCF.  Medical at BCCF was understaffed and he had trouble receiving the medical aids and expert appointments he needed.

81.      Although his health was deteriorating, he maintained the very low custody level of Minimum-Restrictive commiserate with his low security risk.

**E.      In 2023, Things Became Dangerous for Mr. Long but CoreCivic Continued to Insist on Housing Him at BCCF**

82.      In early 2023, Mr. Long began to be extorted and mistreated by BCCF prisoners.

83.      Money was being funneled out of Mr. Long's inmate account to other inmates, against his wishes.

84.      Mr. Long reported his inmate account problems to his CoreCivic case manager, Defendant Lewis, on at least three or four different occasions in 2023.

85.      In mid-2023, CoreCivic case manager, Defendant Lewis, conducted a routine custody reclassification of Mr. Long.

86.      In other words, Defendant Lewis specifically reviewed Mr. Long's history, inmate file, complaints/notes, classification level, safety risk, and any other concerns, and reassessed whether his placement was appropriate.

87.     Ms. Lewis noted that Mr. Long had a low (negative, in fact) score for disciplinary history and for the fact that he was elderly (over 61 years old).  Ms. Lewis also noted that Mr. Long was on the waitlist for participation for his recommended program – SOTMP.

88.     Mr. Long was "on the waitlist" for SOTMP programming because CoreCivic did not even provide sex offender treatment at BCCF.

89.     Based on his custody level score calculated in May 2023, Mr. Long was classified as Minimum-Restrictive – the second lowest security score.

90.     In other words, in May 2023 – five months before his murder – CoreCivic staff was reminded and again made aware of that Mr. Long's custody level was significantly lower than his medium custody general population placement within CoreCivic.

91.     However, in May 2023, the CoreCivic case manager, Ms. Lewis, manually overrode Mr. Long's very low custody score to increase it to medium, thereby allowing him to remain imprisoned within BCCF general population.

92.     Accordingly, because of CoreCivic officials including Defendant Lewis, Mr. Long was forced to remain housed at BCCF.

**F.     In May 2023, Roberts Was Housed With Mr. Long and Began Threatening His Life**

93.     In May 2023, Robert Roberts was placed in the same unit as Mr. Long at BCCF.

94.     In 2021, Mr. Roberts, who was then out on parole, was arrested and charged for attempted murder of his mother after he slit her throat with a boxcutter on her front porch.

95.     Mr. Roberts claimed at the time that "God made me do it."  And he later entered a plea of not guilty by reason of insanity for this offense.

96. In 2023, Mr. Roberts pled guilty to Assault in the First Degree and stipulated to a 20-year DOC sentence.

97. In early 2023, CDOC reviewed Mr. Roberts' crime of conviction, his mental health diagnoses and histories, his safety risk and background, as it does with every incoming prisoner. CDOC concluded that Mr. Roberts was violent, assaultive and had the potential to be violent with other inmates.

98. Mr. Roberts had also previously escaped a CDOC prison in 2018.

99. Mr. Roberts' inmate file reflects that he was in closed custody (*i.e.* the highest security/highest risk) in 2018 and was moved to the RTP program because of his mental health problems.

100. Mr. Roberts' inmate file shows in 2019 he committed an assault on another prisoner. Specifically, he filled a pillowcase with bars of soap and used it as a weapon.

101. Mr. Roberts' inmate file shows in 2020 he committed an assault on another prisoner with intent to cause serious bodily injury and that he was continued to be classified as closed custody and recommended for management control unit (the most restrictive placement). Specifically, he was found kicking another prisoner repeatedly in the head.

102. Mr. Roberts' inmate file shows he spent several years between 2018-2021 in an RTP at a public CDOC facility due to his mental health needs.

103. Mr. Roberts' inmate file shows in 2021 he was given a high psychological score/code indicating his ongoing mental health problems.

104.    Mr. Roberts' inmate file shows years' worth of assessments, like CDOC's Supplemental Reentry Tool ("SRT") scale, that show Mr. Roberts posed a high risk of violence, impulsivity, and was considered a "very high risk" prisoner by various metrics.

105.    Roberts' inmate file has many references to his mental health treatment needs.

106.    In sum, Mr. Roberts' inmate file is replete with these red flags and others showing that he had serious mental health problems, was a significant risk to other prisoners – especially vulnerable prisoners like Mr. Long, and other indicators that an understaffed and violent prison was a very poor place to house him for the safety of others.

107.    Mr. Roberts came back into CDOC custody in 2023 for the attempted murder.

108.    On February 21, 2023, CDOC placed the following alerts on Mr. Roberts and in his inmate file: "VIOLENT CRIME, ASSAULTIVE, VIOLENCE POTENTIAL."

109.    All CoreCivic staff – including Defendants Ensey, Cox, and Lewis – would have seen and been aware of the violence and mental health problems Mr. Roberts' came with when he was placed in the same unit as Mr. Long.

110.    Moreover, when Mr. and Ms. Long later made multiple Complaints about Mr. Roberts' threats of Mr. Long's life, CoreCivic staff – including Defendants Ensey, Cox, and Lewis – would have been aware of the past assaults, violence, and mental health problems Mr. Roberts', and his established history of violence toward others, including other prisoners.

111.    But CoreCivic has a strong financial incentive to take any prisoners it can to fill its beds and make more money, and it welcomed Mr. Roberts into BCCF.

112.    Mr. Roberts was placed in BCCF around March 2023.

113.    Roberts was immediately aggressive and menacing, not just to Mr. Long but to almost all of the prisoners in the unit.

114.    Mr. Long, however, was by far the most vulnerable individual in the unit as he was elderly, physically frail, and in prison for a sex offense against a child.

115.    Quickly thereafter, Roberts began to focus his rage, aggression, and threats toward the elderly Mr. Long, likely after he learned of his conviction.

116.    From May-October 2023, Roberts escalated his bullying, threats, and intimidation of Mr. Long, eventually just targeting Mr. Long.

117.    Other inmates in the unit noticed his relentless harassment of Mr. Long and tried to encourage him to leave "Old Man Tony" alone.

118.    From July-October 2023, Mr. Long repeatedly told CoreCivic officials of the threats, aggression, and exploitation from Roberts, including his case manager, Ms. Lewis.

119.    During these conversations, Mr. Long begged to be separated from Roberts for his safety, even asking to be placed in solitary confinement or protective custody if need be.

120.    According to CDOC policy, a "High Security Offender" is: "An offender who has displayed or has documentation identifying ….history of escape or escape paraphernalia, history of assaultive behavior toward employees or other offenders….or any other factor as determined by the administrative head."

121.    Thus, CoreCivic should have identified Mr. Roberts as a High Security Offender and ensured he was not in a housing situation where he could harm vulnerable prisoners.

122.    Moreover, as a "High Security Offender," Roberts' threats to Mr. Long should have been taken even more seriously by CoreCivic officials than other threats may have been.

123. The Individual Defendants and the CoreCivic staff in the unit would have seen and been aware of the information in Mr. Roberts' inmate file including his high custody/risk level, violent history, and flags/alerts even before his threats to Mr. Long were reported to them.

124. In the weeks and months leading up to the murder, it was well known that Roberts had "checked" Mr. Long's paperwork – *i.e.*, his criminal case records.

125. Checking another inmate's paperwork is a practice that regularly happens in prison where prisoners check other prisoners' case documents to determine their reason for imprisonment to identify and then target, extort, and attack inmates with sexual offenders, and in particular those with child sex offenses, like Mr. Long.

126. In the months before the murder, CoreCivic staff at BCCF were well aware that the other prisoners in Mr. Long's unit checked Mr. Long's paperwork and that the other prisoners were aware that Mr. Long was incarcerated for a sex offense against a child.

127. Indeed, this is why Mr. Long was being targeted, for his crime of conviction.

128. Mr. Roberts called Mr. Long derogatory names in front of CoreCivic officials for weeks before the murder, which would have notified the officials that Mr. Long had been outed and was in even more risk of violence.

129. On information and belief, there were no other sex offenders – or those whose sex offenses were known to others – in this unit during this time except Mr. Long.

130. Mr. Long had a target on his back for his sex offender status and he was at a huge risk as he was not in a sex offender unit but in general population in a violent medium custody prison – BCCF.

131.    CoreCivic officials, including the Individual Defendants, ignored this information and failed to take any action to protect the elderly and vulnerable Mr. Long.

132.    In August 2023, CoreCivic staff re-reviewed Mr. Roberts' file, his custody level, concerns about his housing placement, and his mental health and again decided to keep him housed in general population with Mr. Long at BCCF.

**G.    In the Months Before the Murder, Mr. Roberts' Mental Health Took a Noticeable Decline and CoreCivic's Inadequate Medical Care Program and Deficient Staffing Failed to Provide the Necessary Interventions to Keep Him and Others Safe**

133.    Sadly, Mr. Roberts' mental health deteriorated while he at BCCF.

134.    On information and belief, Mr. Roberts was not receiving adequate mental health care from the CoreCivic medical staff in the months leading up to his fatal attack of Mr. Long.

135.    Roberts' worsening mental health was apparent and alarming to the prisoners and CoreCivic staff who worked in the unit in the weeks leading up to the murder.

136.    Multiple other prisoners in Roberts' unit reported that before the murder he was experiencing "mental issues," including talking and yelling to himself out loud in public, and Roberts was without his mental health medications for approximately one month before he murdered Mr. Long.

137.    Other prisoners reported that in the weeks before the murder, Mr. Roberts was vocalizing his delusions that people were trying to sell him for sex and that he was hallucinating.

138.    On information and belief, CoreCivic officials also knew that Mr. Roberts was experiencing increased and worsening mental health problems in the weeks leading up to the murder.

139.    CoreCivic staff interacting with this deteriorating individual should have ensured that he was provided the mental health care he needed, but they did not.  They should have ensured that he was not a danger to the people around him, but they did not.

**H.    Mr. and Ms. Long Repeatedly Notify CoreCivic Officials – including Defendants Ensey, Cox, and Lewis – of the Risk and Threats from Mr. Roberts to No Avail**

140.    In the months and weeks before Mr. Long's murder, Ms. Long made numerous requests to CoreCivic officials telling them of the risk to Mr. Long, of the extortion of Mr. Long, of the threats by Roberts to Mr. Long.

141.    In all of these calls and messages, Ms. Long begged to have Mr. Long moved for his safety.

142.    In 2023, Ms. Long spoke directly with Defendant Ensey about the risk to Mr. Long in his unit.

143.    While Defendant Ensey was making his rounds to the prison visitors and shaking hands, Ms. Long told him about the threats to Mr. Long and the fact that he was vulnerable and at risk in his unit.

144.    Ms. Long made at least four calls to Defendant Ensey from May-October 2023.

145.    Although Defendant Ensey quickly began to dodge her frequent calls, Ms. Long insisted on leaving messages on his voicemail or with his secretary about the risk and threats to Mr. Long by the mentally unstable and violent Roberts.

146.    In the months leading up to the murder, Ms. Long left at least four messages for Defendant Ensey begging him to protect Mr. Long and move him from the unit.

147.    Ms. Long told Defendant Ensey that she needed to talk to him, that someone was threatening her husband's life and Mr. Long needs to be moved.

148. On information and belief, Defendant Ensey received the voicemails and messages left for him by Ms. Long regarding the risk to her husband by Mr. Roberts.

149. Ms. Long also reached out to Defendant Cox on several occasions before her husband was murdered, telling him about the risk Roberts posed, the threats he was making to Mr. Long, and the danger Mr. Long was in.

150. Ms. Long spoke with Defendant Cox at least twice on the phone in the summer of 2023 regarding the threats to Mr. Long from Mr. Roberts and begged Defendant Cox to move Mr. Long to a safer unit.

151. During these conversations, Defendant Cox told Ms. Long that the Warden (Defendant Ensey) was the one to ultimately decide whether Mr. Long could be moved, and he wasn't able to move Mr. Long.

152. Eventually, Defendant Cox began evading Ms. Long's repeated calls, as well, so she was left leaving messages for him about her concerns as well.

153. Then Ms. Long also started leaving Defendant Cox messages about the risk to Mr. Long and the death threats by Mr. Roberts.  On information and belief, Defendant Cox received those messages left on voicemail and with his secretary.

154. Ms. Long also repeatedly contacted Defendant Lewis, to alert her to the threats to Mr. Long and the immediate need for him to be moved for his safety.

155. Specifically, because Defendant Lewis refused to talk with Ms. Long when she called her, Ms. Long left Defendant Lewis several voicemail messages about the danger Mr. Long was in at BCCF.

156.    Between June-October 2023, Ms. Long left Defendant Lewis at least two voicemails saying it was imperative that Lewis call her back, that Mr. Long needed moved away from Mr. Roberts and his life was in danger.

157.    On information and belief, Defendant Lewis received and listened to the voicemails Ms. Long left for her.

158.    Defendant Lewis never returned Ms. Long's calls and never took any action to investigate the threats to Mr. Long or any action to protect Mr. Long from Mr. Roberts.

159.    In addition to the valiant efforts of Ms. Long from the outside, Mr. Long tried his best to advocate for himself from within BCCF.

160.    Mr. Long sent multiple kites (*i.e.,* written messages) to his case manager, Defendant Lewis, alerting her to the threats of Mr. Roberts and the harassment he was facing, and pleading to be moved away – even to solitary confinement – for his safety.

161.    On information and belief, between July-October 2023, Mr. Long submitted near daily kites to Defendant Lewis about the danger he was in, the threats by Mr. Roberts, and his desperate need to move out of the unit for his safety.

162.    Defendant Lewis took no action in response to the written pleas for help by Mr. Long and did nothing to move Mr. Long away from the violent individual who was harassing and threatening Mr. Long.

163.    Indeed, in the weeks before his murder, Defendant Lewis repeatedly told Mr. Long that he was not going to be moved and that he needed to stop asking her.

164.    Additionally, several weeks before the murder, Ms. Long spoke with CoreCivic's BCCF's Chief Unit Manager Steven Salazar about the threats to Mr. Long from Roberts and pleading for Mr. Long to be moved.

165.    Mr. Salazar told Ms. Long that Mr. Long couldn't be moved until something happened to him.

166.    Moreover, Mr. and Ms. Long repeatedly spoke to each other about the threats and danger of Mr. Roberts on their monitored phone calls for the months leading up to the murder.

167.    On information and belief, CoreCivic officials, including security personnel, monitored and listened to those calls about the threats Mr. Long was receiving from Mr. Roberts and failed to take any action to protect him.

168.    Furthermore, Mr. Roberts' harassment and threats to Mr. Long – and others – were blatant and known by CoreCivic staff working on the unit in the months before Mr. Long's death.

169.    In the weeks leading up to the murder, Mr. Roberts began to publicly call Mr. Long vicious names calling him out as a child sex offender and threatening him, harassment CoreCivic officials tasked with overseeing the two men would have been aware of.

170.    An investigation after the murder revealed that Mr. Roberts had been talking with other prisoners and individuals on monitored phone calls about his desire to kill Mr. Long for at least several days or weeks **before** he ultimately did so.

171.    Other prisoners reported it was known in the unit that Mr. Roberts was going to kill Mr. Long before he did but "there was no talking him out of it."

172. On October 5, 2023, three days before his death, Mr. Long met with his CoreCivic case manager, Defendant Lewis, about how money was being taken out of his account without his permission and that he was being targeted and harassed by other BCCF prisoners in his unit.

173. At this October 5, 2023 meeting, Mr. Long again alerted Defendant Lewis to the threats that Mr. Roberts was making to him claiming that he (Mr. Roberts) would kill him (Mr. Long).

174. Mr. Long again asked his CoreCivic case manager, Defendant Lewis, to be moved out of his unit within BCCF because he was afraid of Mr. Roberts and others in his unit.

175. Mr. Long specifically requested to be placed in protective custody during this conversation with Defendant Lewis or any other placement away from Mr. Roberts.

176. Protective custody is an alternate housing assignment meant to ensure the safety and security of offenders who are at substantial risk of serious harm if placed in a general population setting and where no other reasonable housing alternatives are available.

177. Despite this notice given days before he was beat to death, Mr. Long's CoreCivic case manager, Defendant Lewis, again failed to take any action to protect or move Mr. Long and instead sent him back to his cell.

178. According to CDOC policy, if prison staff "believes a prisoner will be in danger or there is a threat of victimization by other offender(s)," they are expected to initiate involuntary placement of the prisoner in protective custody status, even if the prisoner is unwilling to voluntarily go to protective custody.

179. CoreCivic officials – including Defendants Ensey, Cox, and Lewis – took no action despite the knowledge that Mr. Roberts was targeting Mr. Long for increased harassment, threats, and torment throughout August, September, and October 2023. This violated policy requiring action when a prisoner seeks protective custody after threats, as detailed above.

180. Despite Defendants Ensey, Cox, and Lewis' notice of the substantial risk to Mr. Long, they failed to follow CDOC policy requiring them to put at-risk prisoners, like Mr. Long, in protective custody or another safe place under such circumstances.

181. And Mr. Long continued to be harassed and receive death threats from Mr. Roberts from October 5-8, 2023.

182. Because of the failures of CoreCivic officials – including Defendants Ensey, Cox, and Lewis – to take any protective measures or move Mr. Long, Mr. Long was forced to be housed in the same unit with Mr. Roberts.

183. In sum, CoreCivic knew that Mr. Long should not have been at its facility and it should have sent him to a facility where his medical conditions could be treated, where his security risk was the same as the prisoners around him, and where he wouldn't be targeted for his sex offense.

184. But CoreCivic refused to move Mr. Long or even suggest his transfer because a body in a bed at BCCF is more money for CoreCivic and the County every day.

**I.      On October 8, 2023, Ms. Long Speaks with Her Husband for the Last Time and Roberts Brutally Beats Mr. Long to Death in His CoreCivic Cell**

185. In the morning of, October 8, 2023, Mr. Long called Ms. Long, as usual.

186. Like all of their calls, this call was recorded and monitored by CoreCivic staff.

24

187.      Mr. Long again told Ms. Long that Roberts was getting more violent and making more threats every day.  Mr. Long told her that that morning Roberts told him, very seriously, right in the eye – "if you don't let me make all the calls I want, I will break your neck."

188.      Ms. Long did not know this would be the last time they would speak.

189.      During the morning of October 8, 2023, Mr. Roberts was telling various other prisoners in the unit "I'm gonna go in here and kill [Mr. Long]."

190.      Around noon on October 8, 2023, Mr. Long and his cellmate, Bruce Ocanna, were locked down in their cell and like all others on their unit were eagerly awaiting count to be cleared and to be let out of their cell for chow.

191.      As soon as count cleared and the unit's cell doors were unlocked and opened, video shows Roberts burst from his cell and move quickly and immediately to Mr. Long's cell.

192.      Roberts can be seen rushing to Mr. Long's cell, putting his arm firmly around Mr. Long before guiding him back into the cell.

193.      On information and belief, the video shows Mr. Roberts taking Mr. Long's cane from him and tossing it aside as Roberts turns Mr. Long back toward his cell and forces him back in.

194.      Roberts shut the door behind him, locking himself, Mr. Long, and Mr. Ocanna in the cell.

195.      It is against CDOC and CoreCivic policy for inmates to enter and close the door of another inmate's cell, as Roberts did blatantly and for several minutes in direct view of the officers and video cameras during the murder.

196.     It is also against CDOC and CoreCivic policy to take an elderly man's cane (*i.e.* medical device) and toss it aside.

197.     But no CoreCivic official stepped in to help Mr. Long or check out what was happening.  Instead, Roberts remained in Mr. Long's cell with the door shut for approximately six minutes.

198.     These would be the last horrific minutes of Mr. Long's life.

199.     CoreCivic officials working the unit at that time, including Officer Christian Ptolemy, would have seen Roberts making a run at Mr. Long, tossing his cane aside, and locking himself in Mr. Long's cell right after the cell doors opened and should have checked on the situation and intervened immediately.

200.     On information and belief, the unit was understaffed at the time that Mr. Roberts brazenly ran toward Mr. Long from across the unit, forced Mr. Long into the cell, and spent minutes in that cell beating him to death.

201.     On information and belief, because the unit was understaffed at the time, CoreCivic officials were not properly overseeing the prisoners in that unit during the attack.

202.     But Mr. Ocanna was forced to watch helplessly as the deranged Roberts tortured and killed his friend and cellmate.  And he was later able to report what Roberts did.

203.     During the attack, Roberts ordered Ocanna to sit down and threatened him if he intervened.  Ocanna later refused to identify who killed his cellmate, reasonably fearing for his life.

204.     As soon as he closed the cell door behind him, Roberts began repeatedly punching Mr. Long in the head with his fists until Mr. Long crumbled to the ground.

26

205.     Roberts repeatedly yelled "How many kids?!" at Mr. Long as he punched him. This, of course, is a reference to the conviction Mr. Long was incarcerated for.

206.     Once Roberts got Mr. Long to the ground, Roberts stepped and stomped on Mr. Long's head and throat and used his foot to step on Mr. Long's threat for approximately 3 minutes while Mr. Long let out choking sounds as he struggled through his last breaths.

207.     After several minutes of Roberts stepping on Mr. Long's neck, Mr. Long died from asphyxiation.  Only then did Roberts leave the cell.

208.     On information and belief, had CoreCivic officials intervened during the attack of Mr. Long, they may have been able to save his life.

209.     At about 12:46 pm, Mr. Ocanna approached CoreCivic Correctional Officer Ptolemy in the unit and asked to speak with him.  Ocanna was visibly upset and crying and told him about the attack.

210.     CoreCivic staff then went to their cell and found Mr. Long's unresponsive body, splayed out on the concrete floor.

211.     The fear and pain that the elderly Mr. Long would have suffered during the brutal attack is unimaginable.

**J.     In the Aftermath of the Murder, Ms. Long Is Informed Her Husband Is Dead, Though Left in the Dark That He was Murdered, and Mr. Roberts is Finally Moved From BCCF**

212.     At around 5:30 pm on October 8, 2023, police came to Ms. Long's home and informed her that her husband had died.  She was not told that he was murdered.

213.     The news broke Ms. Long and brought her world crashing down.  She was inconsolable and remains so to this day.  And her mental and physical health deteriorated.

27

214. After the murder, Mr. Roberts was finally moved from BCCF and sent to an RTP unit, where he should have been all along.

215. Mr. Roberts' reassignment paperwork to SCCF notes it is because of Roberts' "multiple mental health crises."

216. BCCF paperwork completed about the murder after the fact notes that BCCF was aware that Mr. Roberts had serious mental illness ("SMI") at the time of the incident.

217. CoreCivic officials, including the Individual Defendants, failed to respond with the adequate investigation and any action to protect Mr. Long when they were specifically alerted to the risk of harm from Mr. Roberts, pursuant to the policies and practices of CoreCivic.

218. Moreover, CoreCivic had financial incentive not to move either prisoner out of the facility, as they would lose money for doing so.

219. On information and belief, Bent County did not conduct an investigation or review of the murder of Mr. Long.

220. And on information and belief, no CoreCivic official was disciplined for their failures to protect Mr. Long or safely incarcerate Mr. Roberts.

**K.    CoreCivic Systematically Understaffed BCCF Throughout the Agreement**

221. As noted, the BOCC/CDOC Contract included a minimum staffing plan for certain key positions provision for BCCF and included provisions for the assessment of liquidated damages when the facility failed to provide the staffing required under the contract.

222. In 2022 alone, CDOC documented over $155k in liquidated damages under the Contract for the dramatic understaffing of critical positions at BCCF. CDOC documented over

15,056 unmanned hours at the critical positions alone.  And, on information and belief, this is only the total understaffing numbers for less than half of 2022.

223.    In 2022, many critical positions were left completely vacant for long periods of time (*i.e.* months) at BCCF in violation of the BOCC/CDOC Contract, including the Chief of Unit Management, Restrictive Housing Officers, Central Control Officers, Mental Health Coordinator and Treatment Counselors, and Corrections Officers.

224.    CDOC's 2022 reports to the BOCC and CoreCivic reflect that case managers at BCCF were forced to step in for security officer roles instead throughout the year.

225.    In December 2022 alone, BCCF was understaffed 168 hours below the minimum staffing level for their mental health coordinator position and it was understaffed 1,176 hours below the minimum staffing level of housing officers in various units.

226.    For BCCF's December 2022 deficient staffing, CDOC's Private Prisons Monitoring Unit assessed $87,820.00 in liquidated damages.

227.    CoreCivic continued its dangerous understaffing at BCCF throughout 2023.

228.    From January-October 2023, CDOC documented that BCCF's staffing for just "critical" staffing positions, was **many thousands of hours** short of the minimum staffing levels proscribed in the Contract including severe vacancies in housing officers, security personnel, and mental health positions.

229.    These records only reflect short staffing in "critical staffing positions," as these are the materials publicly available from CDOC.

230. From January-October 2023, BCCF was so significantly understaffed below its minimum agreed staffing level that the BOCC/CoreCivic faced over $373,000.00 in liquidated damages for violations of the staffing provisions in its contract for BCCF understaffing alone.

231. In May 2023, the Chief of Security of BCCF position was vacated. CoreCivic left this position vacant and without any employee from May 2023 through January 2024 – *i.e.*, for 8 months.

232. On information and belief, the lack of a Chief of Security at BCCF from May 2023 to the date of the murder contributed to the failures of BCCF in addressing the threat that Mr. Roberts posed to Mr. Long and adequately responding to the threats of violence reported to CoreCivic officials.

233. Specifically, the lack of a Chief of Security at BCCF from May to at least October 2023 contributed to the fact that CoreCivic officials didn't respond immediately to Mr. Roberts' forcing Mr. Long – in violation of prison policies and in clear view of cameras and staff – into Long's cell and locking him in there for over five minutes while Roberts killed Mr. Long.

234. In May 2023, the Mental Health Coordinator of BCCF position was also vacated. CoreCivic left this position vacant from May 2023 through June 2024 – *i.e.*, for at least 13 months. This includes the time of Mr. Long's murder and the months leading up to it, when Mr. Roberts' mental health was deteriorating and he was going without mental health medications before he murdered Mr. Long.

235. BCCF allowed its one Mental Health Specialist position to remain vacant from the start of the contract period in July 2023 until March 2024 – *i.e.,* for at least 7 months.

236. This vacancy includes the time of Mr. Long's murder and the months leading up to it, when Mr. Roberts' mental health was deteriorating and he was going without mental health medications before he murdered Mr. Long.

237. Throughout all of July 2023, BCCF had no Chief of Security, no Mental Health Coordinator, and no Mental Health Specialist – in violation of its contract and the minimum staffing requirements it agreed to.

238. Additionally, in July 2023, BCCF was understaffed by hundreds of hours for case managers, counselors, and officers – including housing officers.

239. Indeed, for its staffing deficiencies in July 2023 alone, Defendant CoreCivic was assessed $31,231.00 in liquidated damages for violation of the minimum staffing levels in its contract.

240. Throughout all of August 2023, BCCF had no Chief of Security, no Mental Health Coordinator, and no Mental Health Specialist – in violation of its contract and the minimum staffing requirements it agreed to.

241. Additionally, in August 2023, BCCF was understaffed by hundreds of hours for case managers, counselors, and officers.

242. Indeed, for its staffing deficiencies in August 2023 alone, Defendant CoreCivic was assessed $32,152.00 in liquidated damages for violation of the minimum staffing levels in its contract.

243. Throughout all of September 2023, BCCF had no Chief of Security, no Mental Health Coordinator, and no Mental Health Specialist – in violation of its contract and the minimum staffing requirements it agreed to.

244. Additionally, in September 2023, BCCF was understaffed by hundreds of hours for case managers, counselors, and correctional officers – including housing officers.

245. Indeed, for its staffing deficiencies in September 2023 alone, Defendant CoreCivic was assessed $28,999.00 in liquidated damages for violation of the minimum staffing levels in its contract.

246. Throughout all of October 2023, BCCF had no Chief of Security, no Mental Health Coordinator, and no Mental Health Specialist – in violation of its contract and the minimum staffing requirements it agreed to.

247. Additionally, in October 2023, BCCF was understaffed by hundreds of hours for case managers, counselors, and correctional officers – including housing officers.

248. Specifically, during October 1-7, 2023 (the week leading up to Mr. Long's death) alone – BCCF was short staffed at least the following from their minimum staffing levels, short: 40 hours (entire position vacant) for Chief of Security; 48 hours for Utility Search & Escort Officer 1st Shift; 48 hours for Utility Search & Escort Officer 2nd Shift; 24 hours for Recreation Officer; 60 hours for Armed Transport Officer 2nd Shift; 24 hours for Mental Health Coordinator; 40 hours for Mental Health Specialist; and 40 hours for Vocational Instructor.

249. On information and belief, these staffing shortages were consistent and similar on the date of the murder, October 8, 2023.

250. Indeed, for its staffing deficiencies in October 2023 alone, Defendant CoreCivic was assessed $26,851.00 in liquidated damages for violation of the minimum staffing levels in its contract.

251.    Records indicate that these documented shortages don't even reflect all staffing vacancies and deficiencies at BCCF just those of critical positions.

**L.    All Defendants Were Aware of the Dangerous Staffing Shortages at BCCF**

252.    Defendant CoreCivic knew of all of the understaffing and key position vacancies at BCCF noted herein every month that it was occurring.

253.    CoreCivic decided it was worth losing the liquidated damages for its understaffing rather than filling the roles as it was supposed to under the BOCC/CDOC Contract.

254.    It was cheaper for CoreCivic to understaff BCCF than to staff it according to the minimum staffing levels required in the Contract.

255.    Defendant Ensey received every single monthly report regarding the understaffing at BCCF from 2022-2024, and was thus aware of the staffing deficiencies and key roles that were unfilled for prolonged periods of time from 2022-2024 and beyond while they were occurring.

256.    Defendant Cox, was also aware of the of these staffing deficiencies and key vacancies at BCCF from 2022-2024 and beyond while they were occurring.

257.    Defendant Lewis, as a case manager at BCCF during this time, would also have been aware these staffing shortages that required her colleagues – and possibly her – to pinch hit in security roles.

258.    Throughout 2023, Defendants CoreCivic, BOCC, Ensey, Cox, and Lewis were all aware that the severe staffing shortages in all roles at BCCF – including the most important roles like the Chief of Security, Mental Health Coordinator, and Central Control Officers – meant that prisoners were at a heightened risk of violence from other prisoners.

259.    Throughout 2023, Defendants Ensey, Cox, and Lewis knew that because BCCF was dangerously understaffed, CoreCivic officials would be less able to promptly respond to or intervene in prisoner-on-prisoner violence than if the facility was adequately staffed.

260.    Throughout 2023, Defendants Ensey, Cox, and Lewis knew that because BCCF was dangerously understaffed, there was a heightened need to ensure safe and responsible housing decisions for the prisoners at BCCF and that threats from prisoners needed to be taken even more seriously than in other circumstances.

261.    Additionally, every month of the BOCC/CDOC Contract, Bent County received the information regarding the massive staffing shortages and liquidated damages being assessed by the State of Colorado for the deficient staffing at BCCF, including between 2020-2023.

262.    The BOCC also oversaw and supervised CoreCivic's work at BCCF throughout the times relevant to this Complaint, including between 2020-2023.

263.    For example, from at least 2022-2023, CoreCivic officials in leadership at BCCF, including Defendant Ensey, regularly attended BOCC meetings to provide monthly reports to the BOCC which included updates about the facility and allowed CoreCivic officials to answer questions from the BOCC about the operation of the prison.

264.    BOCC meeting minutes before October 2023 show that, notwithstanding the staffing shortages, CoreCivic and the BOCC were aligned and working together on the goal to increase the prisoner population at BCCF.

265.    As noted, the more prisoners housed at BCCF, the more money that both BCCF and CoreCivic would make under the Contract.

34

266.    In March 2023, Defendant Warden Ensey reported to the BOCC that he was working to increase the prisoner population at BCCF by 300 and that BCCF was still understaffed in the medical program, especially "for things like mental health."

267.    In June 2023, Defendant Ensey again reported to the BOCC and reported the understaffing to the BOCC.  Nonetheless, Defendant Ensey reported at the same BOCC meeting that the facility would be full with over 1300 individuals incarcerated there soon.

268.    In July 2023, Defendant Cox reported to the BOCC for the monthly report.  He noted that the prisoner count was even higher, at 1381.  And Defendant Cox reported during the same meeting that there were many vacancies at BCCF including many vacancies for correctional officers, health care staff, and program instructors.

269.    At this meeting in July 2023, the BOCC did not instruct CoreCivic to stop packing the prison given the staffing shortages.

**M.    CoreCivic Has a Pattern and Practice of Failing to Protect Vulnerable Prisoners in its Care, Especially Those Convicted of Sex Offenses[3]**

270.    CoreCivic has a well-documented pattern of failing to provide safe environments for the prisoners in its care, which is especially harmful to vulnerable prisoners like Mr. Long.

271.    A 2016 DOJ OIG found that "[CoreCivic] contract prisons had the highest rates of inmate fights and inmate assaults on other inmates," of any of the private prison contractors examined.  After this investigation, the DOJ directed the BOP to phase out contracts with CoreCivic noting the increased safety and security problems.

---

[3] Plaintiff detailed many other examples of CoreCivic's patterns and practices at issue in this case in her initial complaint (ECF No. 1); however, was ordered to shorten her complaint by the Court (ECF No. 5).

272.    Shortly thereafter, CoreCivic faced a class action shareholders lawsuit arguing that CoreCivic's public statements to shareholders that it provided a high-quality service at a lower cost than government-run facilities were knowingly false by the CoreCivic executives who made them.  The suit by CoreCivic's own shareholders claimed that the company "ran unsafe, low quality prisons that caused multiple deaths and did not save money."  The court noted CoreCivic executives' emails showing it knew of serious problems with at least some of their facilities and with its staffing practices.

273.    In 2017, CoreCivic prisoner Earl Wayne Johnson was brutally beaten to death by another prisoner after he was repeatedly assaulted, threatened, and extorted by prison gang members at the CoreCivic facility.  He reported the ongoing violence and extortion to CoreCivic supervisors but was ignored by CoreCivic officials.

274.    In 2018, prisoner Nathaniel Lake was in CoreCivic custody when he was nearly beaten to death by another prisoner in Montana.  Mr. Lake was vulnerable as he was convicted of a sex offense but housed with violent non-sex offenders and was beaten under near identical circumstances.  In 2025, a jury found CoreCivic negligent and responsible for the attack.

**N.    CoreCivic has a Pattern and Practice of Systemic Deficient Staffing Which Puts Vulnerable Prisoners at a Known Increased Risk of Harm from Other Prisoners**

275.    Understaffing is a well-known safety risk to prisoners because they necessitate more lockdowns, less rehabilitative and recreation opportunities for prisoners, less safe conditions for officers, and consolidate prisoners into a smaller number of units which can lead to more violence and exacerbate mental health problems.

276.    On information and belief, in 2023, CoreCivic utilized these tactics at BCCF, like cramming incompatible and at-risk prisoners together, because of staffing deficiencies.

277.    For example, in Colorado, in 2004, CoreCivic's CCCF faced a violent and dramatic prison riot because it had only 47 employees on duty to supervise 1,122 inmates.

278.    The 2016 DOJ OIG Report on the BOP Contract with CoreCivic found a deadly May 2012 an inmate riot at a CoreCivic's facility was caused by "systemic" staffing deficiencies.

279.    In June 2019, the non-profit Human Rights Defense Center ("HRDC") conducted an investigation that found that from 2014 through June 2019 the inmate-on-inmate homicide rate was **4.64 times higher** in CoreCivic than public facilities.

280.    CoreCivic's practices in its Tennessee facilities are the same as those in Colorado and at BCCF and across the nation.

281.    In 2021, the U.S. stopped renewing contracts with CoreCivic noting that such facilities do not provide safe working conditions or living conditions for detainees.

**O.    Short Staffing Within Prisons Creates a Dangerous Environment for Prisoners**

282.    Prisons with inadequate staffing are more dangerous – both for prisoners and corrections officials – than those with adequate staffing levels.

283.    For example, the 2023 Tennessee Comptroller Audit emphasized that CoreCivic's staffing shortages put prisoners at an increased risk of violence when there are staffing shortages.

284.    CoreCivic is known for its failure to provide adequate programming, treatment, and to rely on lockdowns due to its staffing shortages in its facilities across the country.

285.    In 2019, the Denver City Council voted to end CoreCivic's contracts to run private halfway houses, at least in part for the substandard care and conditions in those facilities.

286.    In 2022, Colorado lawmakers allocated an additional $5.41 million to address severe staffing shortages in CoreCivic.  In the bill, HB 22-1170, the Colorado legislature stated:

"The general assembly hereby finds, determines, and declares that **this act is necessary for the immediate preservation of the public peace, health, and safety**."

287.    CoreCivic is aware that these practices increase the risk of harm to the inmates in its care but it consciously chooses that tradeoff for higher profits every single day.

288.    BCCF was systematically understaffed during 2023 both for correctional and medical staff.

289.    For example, as of January 2023, BCCF was short staffed by at least 44 positions and imprisoned 1179 prisoners.

290.    In March 2023, CoreCivic reported to the BOCC that BCCF continued to be short staffed in medical operations, especially with respect to mental health providers.

291.    CoreCivic and Bent County have strong incentive to fully fill BCCF, regardless of staffing levels and the safety of the people who have to live there.  And these entities worked tirelessly to fill beds even when understaffing was severe and well-known.

**P.    CoreCivic's Systematic Failures to Provide Adequate Medical and Mental Health Treatment to Its Prisoners Also Makes Its Prisons More Dangerous**

292.    CoreCivic systematically fails to provide the inmates and detainees in its care with adequate mental and medical care.  CoreCivic makes more money the less it spends on medical and mental health care for its prisoners.

293.    For example, several deaths in CoreCivic's Colorado facilities since 2003 were caused by inadequate medical care.

294.    In 2020, the U.S. House found CoreCivic exhibited "widespread failure to provide necessary medical care to detainees with serious and chronic medical conditions, along with critical medical staff shortages," resulting in deaths of detainees.

295.    Defendant BOCC knew of CoreCivic's history and pattern of dangerous operation of prisons described herein but chose to contract with it and chose to turn a blind eye to supervision of the company incarcerating the prisoners the County was responsible for.

296.    On information and belief, Roberts claims in his case that he did not receive adequate mental health treatment while he was imprisoned at BCCF leading to the murder.

297.    Other prisoners who were housed in the same unit as Mr. Long and Roberts noted that Roberts was not getting his mental health medication for weeks before he killed Mr. Long, and that Mr. Roberts was hallucinating and speaking out loud to himself.

298.    The CoreCivic staff in this unit were aware of Mr. Roberts' deteriorating mental health and failed to intervene to protect Roberts or the others around him.

**Q.    Mr. Long's Family Continues to Mourn Their Loss**

299.    Ms. Long has suffered intense grief and emotional distress from the loss of her husband of over 30 years.  And her mental and physical health has declined as a result of her emotional distress over the preventable loss of her husband.

## IV. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of Eighth Amendment - 42 U.S.C. § 1983**
**Unconstitutional Failure to Protect**
**(Plaintiff Estate against Defendants Ensey, Cox, and Lewis)**

300.    The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

301.    The Estate brings this claim against Defendants Virgil Ensey, Larry Cox, and Becky Lewis (collectively "Individual Defendants").

39

302.     Anthony Long was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

303.     The Individual Defendants, at all relevant times, were acting under the color of state law.

304.     The Individual Defendants, at all relevant times, were acting within the course and scope of their official duties and employment.

305.     Defendants Ensey, Cox, and Lewis had a duty to protect Mr. Long from violence at the hands of other prisoners under the Eighth Amendment of the U.S. Constitution.

306.     The Individual Defendants, as private actors working in a prison, are not entitled to qualified immunity.

307.     Mr. Long faced an objective, substantial risk of death or serious bodily injury by being housed with Robert Roberts in general population at BCCF because Mr. Long had been previously targeted and threatened by Mr. Roberts, who was a known violent prisoner with a history of violence against other prisoners and whose mental health was noticeably deteriorating as his mental health was inadequately treated at BCCF, and because the conditions and understaffing at BCCF meant that there were not adequate staff to address issues and violence that would arise.

308.     Mr. and Ms. Long personally and repeatedly notified Defendants Ensey, Cox, and Lewis of the threats from Mr. Roberts against Mr. Long and the significant risk of death and bodily harm he faced from Mr. Roberts.

309.     Defendants Ensey, Cox, and Lewis were aware of Mr. Roberts' threats to Mr. Long, Mr. Roberts' violent assault record in and out of prison, Mr. Long's unique vulnerability

as an elderly man convicted of child sex offenses, the fact that Mr. Roberts' mental health conditions were worsening and inadequately treated before the murder of Mr. Long, and the fact that BCCF was not staffed sufficiently to ensure adequate and prompt responses to prisoner-on-prisoner violence.

310.    The Individual Defendants were aware that Mr. Roberts was extremely dangerous, especially to Mr. Long.

311.    The Individual Defendants were aware of the significant risk of death and bodily harm Mr. Long faced from Robert Roberts.

312.    Given the repeated and escalating threats to Mr. Long by Mr. Roberts, Mr. Roberts' well-documented history of violence against other prisoners, and the known vulnerability of Mr. Long, the risk to Mr. Long of remaining in general population at BCCF in the same unit at Robert Roberts was obvious to the Individual Defendants before his murder.

313.    The Individual Defendants were subjectively aware of the threats to Mr. Long by Mr. Roberts, and the well-known pattern of violence perpetrated against vulnerable prisoners like Mr. Long who are elderly and convicted of child sex offenses.

314.    The Individual Defendants knew and were subjectively aware that Mr. Long faced a substantial risk of death or serious bodily injury at the hands of Mr. Roberts if he continued to be housed in the same unit as him including by: the threats that were reported to them and publicly made by Mr. Roberts; by the unique vulnerabilities of Mr. Long including his status as a child sex offender; by the fact that Mr. Roberts has a documented history of following through on his threats and committing violence against other prisoners; by the fact that Mr. Roberts mental health was inadequately treated and he was noticeably deteriorating; by Ms. Long's direct

41

messages to them about the risks to Mr. Long in that unit; and by their knowledge of the unsafe conditions at BCCF.

315.    Yet the Individual Defendants took no action whatsoever to protect Mr. Long, including failing to move him to a different unit or prison, putting him in protective custody, or increasing staffing in the unit to ensure his safety.

316.    The Individual Defendants failed to take action to keep Mr. Roberts away from Mr. Long in any of the many ways available to them, in violation of CDOC policies.

317.    The Individual Defendants were aware of and ignored the warnings and risk to Mr. Long and exhibited deliberate indifference to Mr. Long's safety and subjected him to being beat to death by Mr. Roberts over the course of several agonizing minutes—which could have been prevented had they properly handled their responsibility to take actions to keep prisoners safe when they know they are at risk of serious harm or death, including by simply moving Mr. Long to a different unit.

318.    The Individual Defendants were aware of the target that Mr. Long had on his back and of his particular vulnerability given their knowledge of the obvious danger of an elderly, frail child sex offender having his paperwork checked and conviction publicly known to the violent and volatile Roberts.

319.    But for the described acts and omissions of the Individual Defendants, Mr. Long would not have been subjected to the brutal attack and beating which resulted in his death on October 8, 2023 by Robert Roberts that was a violation of his constitutional right to be free from cruel and unusual punishment.

320.    Mr. Long's October 8, 2023 attack and murder was a natural and foreseeable consequence of these Defendants' actions and omissions.

321.    The Individual Defendants failed to respond in an objectively reasonable manner when they failed to separate Mr. Long from his eventual murder or to take any other measures to protect him, including but not limited to ensuring he was not housed in the same unit as the man threatening to kill him.

322.    The described acts and inactions were taken by the Individual Defendants with deliberate indifference to the rights of Mr. Long, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to and a reckless disregard for Mr. Long's rights.

323.    The described actions and inactions of the Individual Defendants intentionally deprived Mr. Long of the rights, privileges, liberties, and immunities secured by the Eighth Amendment to the Constitution of the United States of America and caused other damages.

324.    The Individual Defendants personally participated in the constitutional deprivations described herein.

325.    As a direct and proximate result of the actions and inactions of the Individual Defendants, Mr. Long suffered an agonizing and brutal beating by Mr. Roberts on October 8, 2023, and was ultimately asphyxiated and died.

326.    As a result of the actions and inactions of the Individual Defendants, Mr. Long suffered from the unimaginable terror and pain of being forced back into his cell, stomped, punched, kicked, and asphyxiated which caused – in addition to the loss of life – severe emotional distress, humiliation, pain, psychological harm, and other injuries.

327.     Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and other special damages, all in amounts to be proven at trial.

328.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, prejudgment interest and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**Violation of Eighth Amendment - 42 U.S.C. § 1983**
**Unconstitutional Policies, Customs, and Training**
**(Plaintiff Estate against Defendants CoreCivic and BOCC)**

329.     The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

330.     The Estate brings this claim against Defendants CoreCivic and BOCC.

331.     At all times relevant to this Complaint, Defendants acted under the color of state law and are persons for the purposes of 42 U.S.C. § 1983

332.     Anthony Long was a citizen of the United States.

333.     Defendant CoreCivic is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which include its patterns, customs, training, and staffing.

334.     Defendant BOCC is non-delegably liable for CoreCivic's unconstitutional policies, practices, and customs and is also liable for its own failure to provide, supervise, enforce and require constitutional conditions for the prisoners in its care.

335.     CoreCivic had a deliberately indifferent widespread pattern, practice, and custom of increases its profit and the risks to prisoners of violence within its prisons by systematically: understaffing the custody, security staff, and medical and mental health programs; providing

44

inadequate medical care; failing to provide programming opportunities and failing to appropriately and separately house incompatible/differing prisoners; failing to ensure proper and safe housing for vulnerable prisoners in its care, including by sending them out of their facilities if they could not keep them safe; and failing to take action to protect prisoners even when officials were aware of threats and particular risks between inmates.

336. As detailed herein, CoreCivic was aware of its understaffing and the insufficiently safe accommodations at BCCF, and the many risks it poses to prisoners there but deliberately chose to keep BCCF understaffed while increasing the number of prisoners housed there.

337. Defendant CoreCivic's pattern, practice, and custom of accepting and refusing to lose (*i.e.* transfer) prisoners out who should be housed at a different facility based on their needs, security risks, threats made to them, and/or health status is deliberately indifferent and was a moving force in the death of Mr. Long.

338. Defendant CoreCivic failed to train its officials on adequate responses to reports of exploitation, reports of death threats, and actual prisoner-on-prisoner attacks, as illustrated by the facts of this case and the others detailed here, and such failure was deliberately indifferent to the risks that posed for prisoners like Mr. Long.

339. Defendant CoreCivic knew that potentially fatal consequences could be suffered by the individuals in their care because of these policies and practices and by its failure to properly staff, train, and supervise its officials and its failure to develop adequate policies.

340. Defendant CoreCivic ratified the unconstitutional conduct of its employees, agents, and/or subcontractors with regard to the unconstitutional conduct done to Mr. Long as they approved of the conduct and the basis for it.

45

341.    Defendant CoreCivic's unconstitutional acts and omissions were moving forces in the unconstitutional acts of the Individual Defendants and its other agents and were the legal and proximate cause of Mr. Long's injuries and his Estate's losses.

342.    Defendant BOCC was aware that its subcontractor, CoreCivic, had deliberately indifferent policies and practices in its operation of BCCF, including: its security and custody staff shortages; it mental and medical staff shortages; its inadequate medical and mental health programs; BCCF's curtailed programming/recreation/rehabilitation opportunities for prisoners; and BCCF's practice of housing incompatible prisoners in dangerous conditions together.

343.    However, the BOCC failed to take any actions to abate or address these unconstitutional practices.

344.    Moreover, Defendant BOCC failed to train or ensure that officials at BCCF were trained to adequately house, protect, and care for prisoners.

345.    And Defendant BOCC took no actions to supervise its subcontractor CoreCivic despite its knowledge for years that BCCF was understaffed and under resourced, that violence was prevalent at the prison, and that medical and mental health care at the prison was inadequate. For years, the BOCC served as a rubber stamp and money middle man for CoreCivic instead of ensuring oversight of BCCF and CoreCivic.

346.    Defendant BOCC's deliberately indifferent policies, failures to train and/or supervise, were moving forces in the violation of Mr. Long's constitutional rights.

347.    Defendant BOCC was on notice that its deliberate indifference would result and had resulted in a pattern of dangerous conditions at BCCF including understaffing, overcrowding

46

and dangerous housing practices, and inadequate medical and mental health care, causing injuries and death.

348.    Defendant BOCC's failures to train and supervise its subcontractor were so obvious that this inaction was deliberately indifferent to the rights of the relevant public and a moving force in the agonizing death of Mr. Long.

349.    Defendant BOCC, through its policy makers and final decision-makers, ratified the ongoing, systematic, and unconstitutional practices of CoreCivic by rubberstamping all actions and decisions of CoreCivic, including prolonged approval of filling prison beds despite BCCF's severe understaffing and dangerous conditions, in part to make more money.

350.    As a direct and proximate result of CoreCivic's and BOCC's unlawful conduct, Plaintiff Estate has suffered injuries and losses, including the death of Mr. Long, entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and his herein described terrifying pain and suffering during and leading up to and during his fatal attack, and other special damages, all in amounts to be proven at trial.

351.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, prejudgment interest and costs as allowable by federal law.

352.    The Estate is also entitled to punitive damages against CoreCivic, in that its actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Mr. Long.

**THIRD CLAIM FOR RELIEF**
**Wrongful Death**
**(by Plaintiff Norma Long against Defendant CoreCivic)**

47

353.    Plaintiff Norma Long incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

354.    Plaintiff Norma Long brings this claim against Defendant CoreCivic.

355.    Plaintiff Norma Long is the widow of Mr. Long and his next of kin.

356.    CoreCivic is a private corporation that contracts with Bent County to incarcerate and care for prisoners at BCCF.

357.    CoreCivic is vicariously liable for the negligent acts and omissions of its agents and/or employees, including but not limited to, the Individual Defendants.

358.    Individual Defendants are private individuals, not governmental actors, and are therefore not entitled to any immunity under the Colorado Governmental Immunity Act.

359.    Individual Defendants, and any other CoreCivic officials responsible for Mr. Long's safety and order in the prison during the relevant time period had a duty to provide a safe prison environment and to protect prisoners in their care, including Mr. Long.

360.    The Individual Defendants and other CoreCivic officials at BCCF, including correctional officers who worked in the unit where Mr. Long lived and where Mr. Roberts deteriorated and publicly threatened Mr. Long, were acting within the scope of their employment.

361.    With respect to their care and protection of Mr. Long, the Individual Defendants and other CoreCivic officials at BCCF owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of corrections personnel in similar situations.

362.     These duties are also codified under C.R.S. § 16-3-401, which states "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."

363.     Through their actions and omissions, the Individual Defendants and other CoreCivic officials at BCCF breached their respective duties and were negligent in failing to properly assess and house Mr. Long, respond to violent threats by Mr. Roberts, monitor the unit when high and low risk individuals were thrown together, to adequately treat the severe mental illness of Mr. Roberts, and protect the elderly Mr. Long, causing his death.

364.     CoreCivic also had an independent duty to implement reasonable policies and exercise reasonable care in incarcerating vulnerable individuals in its custody at BCCF and ensuring adequate staffing to prevent and appropriately respond to prisoner-on-prisoner violence.

365.     CoreCivic breached its duty directly to exercise reasonable care in a manner that provided prisoners with adequate prison conditions, including a safe environment and protection where necessary.

366.     As a direct and proximate result of CoreCivic's own negligence in staffing, training and supervision, as well as vicariously for its employees, Plaintiff Norma Long has suffered damages, losses and injuries in an amount to be determined by the jury at trial.  These damages include, *inter alia*, upset, grief, loss of her husband, impairment in the quality of her life, anger, depression, and all other purely economic and non-economic damages under the Colorado Wrongful Death Act.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in their favor and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to, the following:

a)      All appropriate relief at law and equity;

b)      All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other noneconomic and economic damages available under the law;

c)      Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all Individual Defendants and Defendant CoreCivic;

d)      Pre-judgment and post-judgment interest at the highest lawful rate;

e)      Attorneys' fees and the costs associated with this action as allowed by law, including expert-witness fees; and

f)      Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS REQUEST TRIAL BY JURY.**

Dated this 2nd day of October 2025.

Respectfully submitted,

s/Aurora L. Randolph
***Aurora L. Randolph***
ALR CIVIL RIGHTS LLC
9878 W. Belleview Ave. Ste. 2129
Denver, CO 80123
Phone: (303) 968-1703
Email: aurora@alrcivilrights.com
*Attorney for Plaintiffs*

50